E-FILED
Wednesday, 26 May, 2021  02:31:27 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| ASHLEY KONNEKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 18-3053 |
| ) | |
| MACOUPIN COUNTY PUBLIC ) | |
| HEALTH DEPARTMENT and ) | |
| KENT TARRO, ) | |
| ) | |
| Defendants. ) | |

OPINION

RICHARD MILLS, United States District Judge:

Ashley Konneker filed a two-count complaint wherein she alleges her rights under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq*. ("the FMLA"), were violated and the Macoupin County Public Health Department ("the Department") failed to pay her agreed upon wages in contravention of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq*. ("the Wage Act").

Pending are the Defendants' motion for summary judgment and the Plaintiff's motion for partial summary judgment.

## I.     BACKGROUND

The Parties

Ashley Konneker began working as a Family Nurse Practitioner (FNP) for the Macoupin County Public Health Department on December 12, 2016.  Konneker had obtained a master's degree in nursing and recently become board certified as a family nurse practitioner.

Defendant Kent Tarro is the Administrator of the Department.  Tarro oversees six facilities.  Peggy Garrison is the Chief Financial Officer of the Department. Garrison is in charge when Tarro is absent.

The Board of Health governs the Department and has the power to overturn the termination of a Department employee.  Angela Weidner was the acting Chief Operating Officer of the Department, the clinic director and Konneker's immediate supervisor.  Weidner was terminated in June 2018.

Macoupin County Public Health Department

The Department has several locations.  The main office was on 805 North Broad Street in Carlinville and the Maple Street Clinic was in Gillespie.  The Gillespie location normally had two providers, Donna Rasmussen and Kelsey Reid. A "provider" can be a nurse practitioner, physician assistant or doctor.  Rasmussen was a physician's assistant and Reid was a nurse practitioner.

2

In early 2016, Tarro was trying to increase the services offered at the Carlinville clinic, which had opened in late 2013, so he asked Rasmussen to work in Carlinville 1 day/week.  By spring 2016, the other provider had left Carlinville and Rasmussen agreed to increase her time there to 2 days/week.  Rasmussen never had a full-time medical assistant in Carlinville to help so she had to perform all of the medical assistant's duties as well as her own and this reduced the number of patients she saw from upwards of 15 to 10 each day.

After Konneker was hired to work full-time in Carlinville, Rasmussen stayed in Carlinville for 2 days/week until about April 2017 to transition her patients to Konneker before returning to Gillespie.  Rasmussen had worked hard to build up the patient population to 195 patients.  About the time Rasmussen left to work full-time in Gillespie, Zenan Hamilton was named as the full-time medical assistant to work in Carlinville.  Konneker worked at both locations, though she testified her time was primarily spent in Carlinville.

Widener was the Department's chief operating officer in 2016 and early 2017.  Weidner testified she was the COO in name only, given that Tarro still made all the decisions.  The Parties dispute the extent of Tarro's ability to observe employees' day-to-day performances.

<u>Konneker's job performance</u>

Konneker's job duties primarily involved working with the WIC[1] families, kids and parents alike, doing the children's milestone visits at 2 months, 4 months, 6 months and 1 year, giving physicals, making sure they were up-to-date on their shots and handling simple procedures.  Konneker could also perform blood draws and help with immunization clinics.

The Defendants claim that, according to Konneker's supervisor, Konneker was not performing her job duties and asked for time off more than 15 times. Konneker disagrees with this assertion and refused to sign her evaluation.  Konneker also claims her immediate supervisor, Weidner, suggested that Tarro did not accurately evaluate Konneker's job performance.  Therefore, Konneker states the suggestion that her supervisor believed she was not performing her job duties is not only disputed, it is disputed by that very supervisor.

Konneker estimated she saw 10 patients over the 3-4 days per week she worked at the Carlinville location.  She has appointments most days, but not every day, at the Carlinville location.

The Defendants allege Konneker's goal was 18-20 patients per day, though when Tarro checked the appointment schedules for the 9 months covered in

---

[1] The Special Supplemental Nutrition Program for Women, Infants and Children (WIC) is a federal health, nutrition and prevention program which, *inter alia*, is designed to safeguard the health of infants and children under age five and pregnant, postpartum, and breastfeeding women who are at risk for nutrition-related illness. WIC is administered by the Illinois Department of Human Services and funded by the United States Department of Agriculture.  www.dhs.state.il.us

Konneker's initial evaluation, he learned that Konneker was seeing between 2 and 2.5 visits per day, which they claim was abysmal. Konneker disputes that her performance or her seeing of patients was "abysmal." She further claims she was never provided an actual "goal." Weidner noted there were problems with the notion she was to see a number of patients. She explained that although the number of patients Konneker saw was lower than what was being seen in Gillespie, that was not Konneker's fault. Konneker was building a clinic from scratch whereas the Gillespie clinic had been operating for seven years.

The Defendants state Tarro found that Konneker was unproductive, insubordinate, incompetent, sneaky, dishonest and the worst-performing medical mid-level he ever had work for him and yet did not terminate her for bad performance. Konneker alleges while that is consistent with Tarro's testimony, he never said anything like that to her before she went on her leave of absence. Tarro had not created any documentation to support his opinion. Significantly, this version of Konneker's performance is disputed by Angela Weidner, her supervisor.

Initial 6-month probationary period

On August 1, 2016, Konneker was sent an acceptance letter that outlined the critical terms and conditions of her employment. Konneker's initial salary would be $84,000 per year. The letter provided that after completing a six-month probationary period, Konneker's salary would increase to $87,360 per year. That would have

been in June of 2017.  Upon completing her annual appraisal, Konneker's salary would increase to $90,854 per year after 12 months.

The August 1, 2016 letter also provided that Konneker's immediate supervisor would be Weidner, who was "overseen" by Tarro.  Tarro was the author of the letter. Weidner is a licensed registered nurse.

Soon after she commenced her employment, Konneker was given two documents that were signed by physicians and titled "scope of practice."  The documents provided her responsibilities were to be those of a nurse practitioner. Illinois law governs the scope of practice of an advanced practice registered nurse. 225 ILCS 65/65-30.

The letter stated that Department personnel policies outline the manner in which the employee policies are administered.  Konneker received a copy of the personnel policy manual and reviewed it.  The policy manual provides that each employee will work a "probationary period" of six months.  Konneker requested that she be given a performance evaluation.  Weidner had told Konneker that if she passed her performance evaluation satisfactorily, she would get the raise and it would be retroactive to her 6-month anniversary.

During her employment, Konneker specifically looked up information on the probationary period in the personnel policy manual and recalled reading that, "At the conclusion of the six-month probationary period, a probationary employee's

performance shall be formally evaluated by his or her supervisor in accordance with the performance evaluation outlined in later paragraphs."

The supervisor is supposed to initiate the performance evaluation for a provider, though Tarro initiates them when the supervisors are too busy. Weidner testified she was not too busy to do Konneker's evaluation, though Tarro told her to not to do Konneker's evaluation or any evaluations.

The personnel policy manual provides, "In order to be eligible for a merit increase, an employee must receive an overall rating from his or her supervisor of satisfactory." Konneker claims this statement is not relevant because a "merit" increase is not part of the dispute. Rather, it is a contractually agreed upon increase in wages.

Konneker did not receive a formal evaluation at her 6-month anniversary in June. However, Weidner told Konneker that her 6-month raise would be retroactive to June if Konneker received a satisfactory evaluation. Tarro acknowledged they were behind on the performance evaluations but once Konneker's evaluation was completed, Weidner and Garrison both told Tarro the timing was not good to give Konneker such a horrible evaluation because of personal issues she was experiencing.

Konneker never received an overall rating of satisfactory.   While true, Konneker claims the assertion is irrelevant because the dispute does not involve a "merit" increase.  It involves a contractually agreed upon increase in wages.

In July of 2017, Konneker advised her employer that she was pregnant and that she was expecting her baby in February of 2018.  The Department did not increase Konneker's salary after she had been there for six months.  Konneker asked her supervisor about her increase in pay and was told that Tarro would get around to it.

<u>HIPAA training and patient records</u>

Konneker received HIPAA[2] training shortly after she got hired and had received HIPAA training in the past from other employers.  She read through a packet of information and signed that she had completed it.  Konneker knew it was important to keep medical records confidential and that a violation of HIPAA was serious.  She was aware that even unintentional disclosures of protected health information could result in discipline.

The Defendants claim the Department eliminated paper files containing ongoing patient information some time ago and requires that all files be scanned into the electronic record and the paper files destroyed.  Konneker states that paper files

---

[2] The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge.  www.cdc.gov/phlp/publications/topics/hipaa

existed of certain types of records.  Konneker knew that with the exception of face sheets which contained information only on the level of care provided, patient records were to be stored in the computer and a safety program was on the system. She also knew that HIPAA does not allow medical providers to make copies of patient records without written authorization from the patient.  Konneker signed a "Workforce Confidentiality Agreement" stating she had a responsibility to keep patient information protected and that she will not make any unauthorized transmissions, copies, disclosures, inquiries, modifications or purge any PHI, patient and/or confidential information from Department records or systems.

Suboxone license/Opioid Addiction Clinic

The APRN scope of practice provision in the Nurse Practice Act includes an advanced practice registered nurse's authority to prescribe controlled substances as provided in Section 65-40 of the Act.  225 ILCS 65/65-30(c)(6).  In order for an advanced practice registered nurse to prescribe controlled substances under the Nurse Practice Act, she must obtain a mid-level practitioner controlled substance license.  225 ILCS 65/65-40(b).  Konneker had such a license.

The Opiate Addiction and Treatment Recovery Program opened sometime in 2017.  The Defendants allege Tarro made it part of every mid-level provider's job to get a suboxone license so that if there was only one provider working on Friday or in Carlinville, she could continue to prescribe medicine so the patient did not start

9

using again.  The medical mid-level providers were informed of this requirement via email and staff meetings.  Weidner testified that suboxone was a big money maker for the Department.  The Defendants assert it was imperative that Konneker get licensed because Tarro had 3 providers who were suboxone-licensed but Kelsey left and Samantha was going on maternity leave, which meant Donna Rasmussen was the only licensed provider.  Moreover, Konneker's supervisor repeatedly asked her to get the suboxone license, but she never even started the process let alone obtained her license.  Konneker disputes the previous statements, contending no documents support the assertion that every practitioner was required to obtain a suboxone license.  Moreover, Weidner testified only one provider had a suboxone license.  She explained that writing prescriptions on Friday was not of consequence because there was a rule that prescriptions were not to be written on a Friday because it was before the weekend.  Weidner did not expect that all nurse practitioners would get their suboxone certificate.

Konneker received a job description for a nurse practitioner that included "willingness to be cross trained to provide other integrative services as needed" and "performance of other duties as required or assigned" as part of her job description. Konneker notes she was hired as a family nurse practitioner, which is completely different from the type of work she performed.

The Defendants allege Konneker understood that if her supervisor asked her to perform other duties, she was required to do so. Konneker notes that, while this is a reference to the "other duties as assigned" provision, it does not mean that her supervisor could completely alter her scope of practice. Moreover, Konneker's supervisor, Weidner, testified this is not something she was required to do.

Konneker's pre-FMLA Leave of Absence

On October 18, 2017, Konneker had an appointment with her healthcare specialist and learned that her baby was incompatible with life and would not survive. She went to the hospital to be induced and delivered her baby on October 21, 2017. The baby lived for only a couple of hours. Konneker remained in the hospital for several days. She did not return to work after losing her baby. Weidner testified she agreed with Konneker's statement that Konneker was in "direct communication" with her when Konneker was away from the office for medical reasons.

Konneker testified she asked to come back to work under the proviso that she be allowed to take time off for counseling appointments but was told that would not be allowed. Her last paycheck was for the pay period October 15 to October 28, 2017.

The Defendants allege Konneker's return to work date was fluid; she would tell her supervisor she was coming back to work on a certain date, then not come

back, then give a different date, and still not come back to work and Weidner had to call her for clarification when she would return so they could reschedule patients. Konneker disputes the allegations, claiming that discovery shows she was in constant contact with Weidner about her plans.

The Defendants claim Tarro was in support of Konneker taking time off if she needed time to recover, despite his frustration with Konneker's ever-changing return to work date.  Konneker disputes the portion of the allegation which provides that Tarro was frustrated with the changing return to work date.  She claims there is no evidence in support of that assertion.

Konneker kept in touch with Weidner almost daily via text messages or phone calls but Weidner never shared Konneker's messages with Tarro.  Konneker notes the fact that Weidner did not share this information with Tarro is irrelevant because Konneker's obligation was to relay this information to her immediate supervisor.

The Defendants allege that after Konneker left in October, there was no provider in Carlinville, no continuity of care and no transition plan for the Carlinville patients who now had to be transferred to Gillespie or find a new provider elsewhere. Konneker disputes the statement to the extent it suggests she simply disappeared. Moreover, there is no evidence that there was a problem with continuity of care.

Konneker understood from speaking with Weidner prior to her FMLA leave that all of her patients at Carlinville were told to go to the Gillespie office.  The

12

medical assistant, Zenan Hamilton, also had to transfer to Gillespie because there was no provider to work with in Carlinville.

FMLA leave

Tarro was only somewhat familiar with the FMLA and let Garrison and the supervisors administer it.  If Tarro and Garrison had a question about the FMLA, they consulted with the State's Attorney's Office.  Garrison handled Konneker's FMLA leave in December 2017 but she did not receive training on the FMLA until 2018.  Garrison was not certain which forms to use for Konneker's FMLA leave so she sent drafts of two forms and a cover letter for the designation notice to Assistant State's Attorney Brent Cain for guidance, and then ASA Cain sent all the forms, including the forms Konneker sent to the Department on January 11th, to Konneker's attorney in response to his letter.  Garrison's forms had the return to work date of March 7, 2018 on them.  The draft FMLA forms had different methods of calculating the 12-month period.

The Defendants allege Garrison purchased FMLA posters annually for various locations of the Department and, at the Carlinville office, she hung up the updated FMLA poster each year in the entry room where all the employees enter the building.  Konneker disputes there was an FMLA poster for review in the Carlinville office.

13

Sometime in November after Konneker's paid time ran out, Weidner told Konneker she needed to get FMLA paperwork filled out to protect her job. Konneker went online and printed the FMLA paperwork. The next time Konneker was at the Carlinville office was on December 6, 2017, after Garrison texted her and asked to meet with Garrison and Tarro. Konneker faxed her FMLA forms to the office prior to the meeting. At the December 6 meeting, Konneker told Tarro and Garrison that she was dealing with a number of personal issues and was under stress and would be taking a medical leave of absence protected by the FMLA effective December 13, 2017. During the meeting, Konneker provided documentation from her physician. This was the first time Konneker discussed taking FMLA leave with Tarro or Garrison. Konneker, Tarro and Garrison discussed when Konneker could come back to work and Tarro and Garrison told Konneker that she was not eligible for FMLA until her one-year anniversary. Despite the law requiring that it do so, no one from the Department provided Konneker with an eligibility notice or a rights and responsibilities notice at the time of her request.

Konneker discussed the fact that they were moving her to Gillespie instead of Carlinville and she felt it was punishment for having taken time off. However, Garrison explained that because Konneker had been gone for so long, there no longer was a clinic in Carlinville because they had no one to replace Konneker and they were moving everything to Gillespie. They needed her in Gillespie because the other

14

nurse practitioner was going on maternity leave and the one physician assistant could not handle the work load there alone.  Garrison told Konneker that they hoped to have the new Morgan Street clinic open the following summer and then Konneker could return to work in Carlinville.  The WIC Program moved to the Morgan Street Clinic in August 2018 and medical clinic opened there on a part-time basis in January 2019.  Konneker claims this conversation did not take place in December.  Rather, it occurred in January during the meeting when she was notified she was being placed on probation.

The Defendants allege Tarro and Garrison told Konneker that her FMLA leave was approved but she needed to have her physician change the start date to December 13th so Konneker took the FMLA forms, sent them back to her physicians to change the date and on January 11, 2018, faxed them back to the office.  She also sent FMLA paperwork completed by her counselor.   Konneker disputes the suggestion that she did not send them back until January 11, 2018.  Tarro and Garrison told Konneker on December 6th that even though she was out of paid time off, Konneker could remain off work until her FMLA kicked in.  They had already approved Konneker's time off since October and had no more time off available.  Konneker remained off work until her leave began on December 13th and knew she needed to come back to work on March 7th after her 12-week leave ended.  Garrison told her on December 6th that the leave was for 12 weeks.

15

Konneker's alleged HIPAA violations

The Defendants allege that on December 6th, the date Konneker came to the office to meet with Tarro and Garrison, she went into her office to search for a patient file she kept in her desk. Konneker did not tell Tarro or Garrison she was searching for a patient file and they were not present while she searched. When Konneker could not locate the file, she texted her medical assistant, Hamilton, who had worked with her at the Carlinville office and asked her if she knew where the file was because she needed it. Konneker had to complete the forms so that her patient could have her bariatric surgery covered by insurance. Konneker texted Hamilton that she wanted to chat with her, but not while she was at work, and Hamilton was not to tell anyone she talked to Konneker. Konneker asked for a specific patient's file and indicated she needed to get it to the patient today or tomorrow. Hamilton got nervous and eventually told the lead medical assistant and Tarro about Konneker's text messages.

The Defendants claim that Konneker should have talked to Tarro, Garrison, Weidner or any of the providers in Gillespie about getting this file for the patient, but she never did. Weidner told Konneker, "Any communications about [patients] needs to come thru me, not mas [medical assistants]." Weidner added, "U cannot take a pts file and deliver it to them. We have called all ur pts."

The Defendants allege that at a meeting on December 8th with Garrison and Konneker, Tarro showed Konneker the text messages she sent to Hamilton and gave her a chance to explain herself.   Konneker told Garrison that Weidner had sent her text messages about a patient in the past, but Konneker never told anyone or reported it until then, December 8th.  Weidner later explained that the individual was not yet a patient at the time of the text.

The Defendants claim that after listening to Konneker's explanation, Tarro told her she violated HIPAA and terminated her.  Tarro had hoped that Konneker would go on her FMLA leave and come back ready to work; the HIPAA violations were the last straw and grounds for immediate dismissal.  Tarro did not discuss the termination with Weidner, who did not even know about it until after it had occurred.

Garrison told Konneker that if she wanted to challenge the termination, she could appeal to the Board of Health at their next meeting on December 20th.  The termination was not shared with anyone and was put in Konneker's personnel file.

Konneker responds to the Defendants' allegations concerning "HIPAA Violations" as follows:

> She did not violate HIPAA.  She would note that despite claiming that she violated HIPAA, there has never been an explanation offered by the Defendants as to how it was that she actually violated the law.
> As the sealed portion of Konneker's deposition makes clear, she did have a patient who saw her prior to a bariatric surgery.  As part of that process the patient had to come in for a weight check on a monthly basis.  The forms that she had were simply these weight check ins

17

and they were in her locked desked drawer.  While Konneker was out
her patient needed to have them transferred to her new doctor.
The reason she was looking for them when she was in the office was
simply so that they could be transferred to her new physician.
Tarro claims that this was a HIPAA violation, however, has failed to
explain how it would constitute any such violation.  From a general
perspective, the HIPAA privacy rule is found at 45 C.F.R. § 164.502.
There are other provisions that continue from 164.503-512.  The
privacy rule essentially insures that protected health information is not
disclosed to others.  The privacy rule  deals with disclosures of
protected health information.  There has never been a suggestion that
Konneker disclosed protected health information to anyone.  For
this reason, it is a significant stretch to suggest that Konneker violated
HIPAA.  She had a document at the medical clinic that was not
disclosed to a third party.        There is no violation of HIPAA.
Tarro's claim that she violated it is spurious and not based upon the
law.  A jury could certainly look at his testimony and conclude that he
was simply making up the HIPAA violation as pretext to terminate her
employment.  Again, the  HIPAA privacy rule deals with the disclosure
of protected health information.  The Department can not show that
there was any disclosure, much less that such a disclosure violated
HIPAA.

d/e 24, No. 14-15.  Konneker further alleges Weidner testified that when Tarro

discussed Konneker's termination with her, he told Weidner she was terminated for

a lack of performance.  The Defendants dispute this assertion, noting Weidner

testified she thinks lack of performance was the reason but she had no role in the

decision and was not present at the meeting.  Weidner also noted the evaluation

mentions performance and Tarro kept talking about performance.  Konneker asserts

Weidner testified that the first she learned the decision was because of a supposed

HIPAA violation was during the course of her deposition.  The Defendants dispute

the statement and note that Weidner knew of the HIPAA violation at the December 20, 2017 Board meeting.

<u>Board of Health Meeting on December 20, 2017</u>

Konneker met with the Board of Health members and Garrison on December 20th to appeal her termination.  Konneker prepared a typed explanation of what happened, why she was off work, complications with her pregnancy, etc., and included a copy of the text message about needing the patient's file, and shared it with everyone at the board meeting.

The Parties dispute precisely what happened at the meeting.  The Defendants claim Konneker was very emotional and told the Board Members about her daughter who had lived only 2 hours after her birth.  They allege Konneker struggled to process what happened and begged for her job back.

Konneker states the suggestion that she "begged" for her job back is not accurate.  Konneker claims she told the Board her termination was wrong on a number of different levels.  They did not discuss her evaluation or the reasons she was terminated  or any supposed HIPPA violation.  Konneker claims that a motion was made to reinstate her after appropriate evaluation.  The motion carried.

The Defendants allege Konneker told the Board she was terminated earlier in the month for sending text messages to her medical assistant about a patient at the clinic and keeping the patient's medical file in her unlocked desk drawer in violation

of HIPAA, but she felt termination was too harsh.  In response, Konneker notes she did not acknowledge any type of HIPAA violation.  While she could understand being written up, Konneker believed "termination for this was wrongful on so many levels."

Konneker left and Tarro joined the meeting to discuss Konneker's work performance and what she had done.  The Defendants allege Tarro told the Board members about Konneker's poor work performance, the evaluation she was supposed to have received after six months and how after he completed the evaluation, he shared it with Garrison and Weidner to get their input and they thought it was not the right time to give Konneker such a bad evaluation since she was going through such a difficult time in her personal life.  Konneker disputes that her work performance was poor.  Konneker alleges her FMLA leave created difficulties for the Department in managing patients and Tarro was frustrated by her leave.  The Defendants dispute the assertion, noting Weidner testified she thought Tarro was frustrated because they lost another provider, Kelsey, who decided not to come back to work.  Weidner did not know how much of the frustration was about Konneker not being there.

The Defendants claim that a majority of the board members were very sympathetic to Konneker's personal situation and wanted to give her a second

chance, despite her HIPAA violations.  Konneker disputes that she engaged in any HIPAA violations.

Konneker's conditional reinstatement

In January of 2018, Konneker attended a meeting in which her reinstatement was discussed.  Tarro, Weidner, Peggy Garrison and Ralph March were present for that meeting.

The Defendants allege the Board voted to reinstate Konneker on the condition that she meet with Tarro and Board Chairman March in January before the next board meeting to discuss her employee evaluation and the terms of her probation. Konneker would be on probation for 3 months when she returned to work in Gillespie and that probationary period could be extended another 3 months, if necessary.  Konneker disputes the allegation on the basis that the Board said nothing about probation.  There is no mention of "probation" in the minutes.

Konneker's employee evaluation

The group reviewed the employee evaluation that had been completed for the period December 15, 2016 to September 15, 2017, as Konneker's initial 6-month probationary evaluation.  The first time Konneker received a performance evaluation of any type was on January 16, 2018.  Tarro had the evaluation completed in September but Weidner and Garrison felt sorry for Konneker's multiple situations and by the time they all finished discussing it, Konneker was gone.  Konneker

disputes the allegation on the basis of Weidner's testimony.  Konneker disputes the suggestion that the evaluation given to her in January was the same evaluation that Tarro had completed in the fall.  Konneker disagreed with the performance evaluation and refused to sign it.

The Defendants allege Tarro had sympathy for Konneker and, for a number of reasons, did everything he could to give her a chance to turn around her poor performance.  Tarro had hoped that with her background and experience, Konneker would attract patients from the area and over time grow into a good nurse practitioner.  Konneker disputes any suggestion she was not performing her duties properly.

The Defendants assert Konneker's production was low and she admitted not being close to meeting her objective of seeing 200 patients per month during that time period.  Konneker claims 200 patients per month was never expressed as a goal prior to the evaluation.  It was going to take time to get the numbers up at a new clinic.

The focus of the Carlinville clinic was to increase the number of WIC patients. The goal was to ensure that infants and children received healthy child check-ups when they came in for their WIC appointments without having to switch doctors or make additional appointments.  The Defendants allege WIC engagement was the number one priority for hiring someone to work in Carlinville and Konneker failed

at it.  Konneker disputes the assertion about WIC engagement, stating it is not supported by the documentation such as her job description.

Konneker had her own office at the Carlinville location, but it was located on the south side of the conference room completely removed from the WIC clinic on the north side of the main building.  The Defendants claim Tarro did not like Konneker being in her private office because he wanted her to be in the WIC clinic and see more WIC patients.  During her interview, Konneker told Tarro that she had no problem working in the WIC program front office.  Konneker disputes the allegations on the basis she was never told that WIC engagement was the first priority.  Konneker testified that she discussed services available to WIC families and at least one or two people followed up on those services.

Terms of Konneker's probationary status

Board Chairman March left the meeting and called Konneker to tell her that the Board reinstated her, but she had to meet with Chairman March and Tarro in January to discuss her employee evaluation and the terms of her probation. Konneker received a call to come to the office on January 16, 2018 to discuss the terms of her reinstatement.  The group also reviewed the probationary status form. The Parties dispute whether her probation status modified the terms and conditions of Konneker's employment.  The Defendants say the document simply reiterated the terms and conditions of her employment that were previously given and with which

they allege Konneker failed to comply.  Moreover, there is a dispute regarding whether Konneker was told that if she did not comply with all of the requirements of the probation document, her employment would be terminated immediately.

Upon her return to work, Konneker would need to comply with HIPAA rules and regulations, engage WIC patients, work full-time with day and evening shifts, draw blood and give immunizations and other tests, function as a medical assistant when needed, obtain her Suboxone license and work in Gillespie.  Konneker notes that the terms of her probation were in writing.

The Defendants allege that, upon Konneker's return to work after the FMLA leave, all of the exam rooms at the Maple Street Clinic were fully booked on Wednesdays so Konneker could not be scheduled to work that day.  Moreover, Konneker's probationary status form indicated that Konneker will work Wednesday if needed, but Tarro explained that was to cover for a provider who was sick or on vacation since no exam rooms were available.  Konneker responds by noting Tarro testified that Weidner made up the schedule and there was a jam up at the clinic on Wednesdays.  Weidner testified they could have altered other people's schedules to allow Konneker to work on Wednesday.

Konneker understood that her patients from Carlinville had all been transferred to Gillespie because there was no provider at Carlinville.  She knew she could not return to Carlinville until the Morgan Street Clinic opened.   The

Defendants allege Konneker's new work schedule would include three evenings a week and to help out as needed. She did not ask for other hours and never indicated that she would prefer to have different hours in Gillespie. Tarro testified Konneker told him she had no limits on working evenings. Konneker claims she did object to the probation and requested that it be rescinded. Moreover, when she was given the probation document, Konneker stated these hours were "completely different" and she "was not working every night until 6:30, 7:00." Konneker testified that at the time she was hired, she was not willing to work more than one night per week. Moreover, Konneker alleges the work schedule given to her when she was to return from her leave provided that she would work at the Maple Street Clinic full-time (and Wednesday if needed and evenings as scheduled): Monday – 8:30-6:30; Tuesday – 7:30-6:00; Wednesday – Off; Thursday – 8:30-7:00; and Friday – 7:30-4:30.

The Defendants allege another term of Konneker's probation was that she had to request off one month in advance, if possible, but this was already in effect for the providers at the Maple Street Clinic. Konneker disputes this was a policy in effect before her probation. There is no requirement that notice be given 30 days in advance.

The Defendants claim that following the January 16th meeting, Konneker never contacted Garrison, Tarro, Chairman March or the Board regarding her

dissatisfaction with the terms of her reinstatement. If Konneker had not resigned, she could have transferred back to Carlinville later that year. Konneker disputes the statement on the basis that, on February 6, 2018 she, through her attorney, wrote a letter to Tarro complaining about the probation and requesting that it be rescinded.

Konneker's full-duty return to work

On January 9, 2018, Konneker's doctor told her she would give her a month and would like to see her to follow up, but for insurance purposes, she would "say mid-March for her date of release." During that same visit on January 9th, Konneker told her doctor that her "place of work is not working well with her time off and are trying to make her move offices to where she doesn't feel comfortable," but she failed to tell her doctor it was because there were no more patients at Carlinville.

On January 9, 2018, Konneker told her doctor she was currently looking for jobs elsewhere. The Defendants claim that, at the time, Konneker did not know if she would return to work at the health department and she had already retained an attorney. Konneker states there is nothing in the record to suggest that she had retained an attorney before February 6, 2018.

The Defendants allege Konneker did not like working in the Gillespie office because she liked working with pediatrics and there were more pediatric patients in Carlinville than in Gillespie. She was uncomfortable working with addiction issues and had no experience doing so. Konneker claimed that she did not want to work in

26

Gillespie after she returned from her FMLA leave because the nurse practitioner there was pregnant and she knew it would be uncomfortable and difficult to sit next to her every day.  Konneker thought she could work with pregnant patients at Carlinville because she would treat them and they would leave so she would not have to sit next to them all day.

On February 5, 2018, Konneker's doctor completed an IMRF disability claim form indicating that Konneker was continuously disabled from October 21, 2017 through March 1, 2018.  On February 7, 2018, Konneker's doctor released her to return to work on March 7, 2018 without restrictions.  Konneker never asked for more time off beyond the March 7th return date.  Konneker stated she could return to work on March 7, 2018.  By this time, Konneker felt she could work with pregnant women and children at either location without getting upset.  Konneker felt she could have returned to work on March 1, 2018.

<u>Loan repayment program and Konneker's resignation</u>

Konneker applied to work at the Department so that she could participate in a loan repayment program.  In order to receive assistance, Konneker had to work in a rural healthcare facility, such as the Macoupin County Public Health Department, for two years.

The grant agreement outlined Konneker's obligations under the loan repayment program.  Konneker agreed "to provide primary health services" at the

Macoupin County Public Health Department, Maple Street Clinic, in Gillespie. Konneker did not satisfy her obligations under the grant agreement and had to pay for the remainder of her two-year commitment.

As early as February 2018, Konneker contacted the Department of Public Health to inquire about the breach amount if she decided not to return to work at the Department. At that time, Konneker had already started applying for jobs. Despite her two-year obligation at the Department and despite her full-duty release, Konneker resigned on March 7, 2018 rather than return to work. Konneker claims she resigned because she was not being reinstated to the position she held before her leave of absence, an assertion the Defendants dispute. The Defendants say Konneker gave different explanations for her resignation. Konneker claimed she did not want to work in Gillespie because the nurse practitioner there was pregnant and she knew it would be uncomfortable and difficult to sit next to her every day. She thought she could work with pregnant patients at Carlinville because she would treat them and they would leave so she would not have to sit next to them all day. Konneker did not like working in the Gillespie office because she liked working with pediatrics and there were more pediatric patients in Carlinville than Gillespie. By the time her FMLA leave expired on March 7, 2018, Konneker felt she could work with pregnant women and children at either location without getting upset.

Prior to Konneker requesting an FMLA leave, no Department employee had ever requested an FMLA-protected leave.  The Parties dispute whether employees were ever trained on FMLA leave or the FMLA.  The Department's FMLA policy was implemented after Konneker requested her leave of absence.  At the time that Konneker worked at the Department, it had at least 100 employees.

Konneker claims there were a number of problems with the physical layout of the Carlinville location.  Moreover, Tarro knew that the Carlinville location was not conducive to a medical clinic.  The Defendants dispute these assertions and claim that while it was an old building, everything was still functional.  Moreover, Tarro wanted to build up the Carlinville Clinic to serve the population in that part of the County.

Konneker further asserts that as it relates to the supposed HIPAA issue, Tarro told Weidner that she was just as culpable for it as Konneker was.  The Defendants dispute the assertion, claiming that there were HIPAA violations.  Weidner testified that the reason for Konneker's termination was the "definition of a HIPAA violation."  When Konneker appealed her termination to the Board of Health, she told the Board members that Weidner had violated HIPAA when she discussed a patient using her cell phone and Weidner was not terminated for that.  Konneker never told Tarro about Weidner's alleged HIPAA violation until her termination meeting on December 8th.  Tarro confronted Weidner about her alleged HIPAA

violation and Weidner explained that she did text about an individual but at the time of the text, the individual was not yet a patient.  Weidner asked Tarro to share her explanation with the Board.

Konneker's complaint includes claims for FMLA interference and retaliation against the Department and Tarro.  Konneker also asserts a claim under the Illinois Wage Payment and Collection Act as to the Department, seeking payment for the wages to which she alleges she is entitled after completing her probationary period.

In her motion for partial summary judgment, Konneker alleges there are no factual disputes that the Department and Tarro failed to reinstate her to an equivalent job position, thereby interfering with her rights under the FMLA.  As for her Wage Act claim, Konneker claims there is no dispute that her wages were not increased after six months as required by agreement with the Department.  Konneker seeks summary judgment on those issues.

The Defendants allege Konneker has failed to state an FMLA interference claim and an FMLA retaliation claim.  Moreover, Tarro should not be individually liable and is entitled to qualified immunity.  The Defendants further assert summary judgment is warranted on Konneker's Illinois Wage Payment and Collection Act claim.  Accordingly, the Defendants seek the entry of summary judgment on each of the counts.

## II.    DISCUSSION

Legal standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  The Court views the evidence and construes all reasonable inferences in favor of the non-movant.  *See Driveline Systems, LLC v. Arctic Cat, Inc.*, 936 F.3d 576, 579 (7th Cir. 2019).  To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture."  *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted).   "The court does not assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence."  *Driveline Systems*, 36 F.3d at 579 (internal quotation marks omitted).  Ultimately, there must be enough evidence in favor of the non-movant to permit a jury to return a verdict in its favor.  *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

FMLA interference

(1)

"[T]he FMLA provides that an employer may not 'interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act].'" *Brown v. Auto Components Holdings, LLC,* 622 F.3d 685, 689 (7th Cir. 2010)

(quoting 29 U.S.C. § 2615(a)(1).  "To prevail on an FMLA-interference claim, an employee must demonstrate that: (1) she was eligible for FMLA protection; (2) her employer was covered by the FMLA; (3) she was entitled to FMLA leave; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her benefits to which she was entitled."  *Id*.

The Defendants contend Konneker cannot state an FMLA claim because she cannot show she was prejudiced by any technical violations that may have occurred. A plaintiff cannot prevent summary judgment by creating a factual dispute over the defendant's lack of compliance with the FMLA—she must also show she was prejudiced by the defendant's violation.  *See Lutes v. United Trailers, Inc.*, 950 F.3d 359, 368 (7th Cir. 2020) (citing 29 C.F.R. 825.301(e)); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (explaining that FMLA "provides no relief unless the employee has been prejudiced by the violation").  The Defendants claim Konneker's interference claims are without merit because she was unwilling to return to work upon the expiration of her leave.

The Defendants also assert Konneker failed to provide 30 days advance notice of the need to take FMLA leave, as required by 29 U.S.C. § 2612(e)(2).  Moreover, Konneker failed to provide the proper medical certification, as required by 29 C.F.R. § 825.305(a).  The Defendants further contend that Konneker cannot show Defendants denied her FMLA benefits because she was granted a 12-week leave

under the FMLA.  Konneker knew her return date was March 7, 2018.  She was offered reinstatement in Gillespie on similar terms and conditions and was never denied an additional 12-week leave.

Konneker alleges there are three critical areas in which her job duties were changed from when she went on her FMLA leave to what she was told her job would be when she returned: (1) she was required to obtain a suboxone certificate which would have required her to engage in a different type of medical practice; (2) her hours were changed and she was expected to work on weekends; and (3) she was required to request time off for doctor appointments one month before the appointment was to take place.

Konneker claims the Department and Tarro interfered with her rights under the FMLA by significantly restructuring her job when she returned.  The Department was not willing to restore her to her original position of employment, which Konneker claims violates her substantive rights and constitutes FMLA interference. Konneker alleges the reason she chose not to return to work was because her job had been altered so significantly.

Konneker notes the regulations provide that an employer must bring the employee back to an "equivalent position," which is defined as:

> An equivalent position is one that is virtually identical
> to the employee's former position in terms of pay,
> benefits and working conditions, including privileges,
> perquisites and status.  It must involve the same or

substantially similar duties and responsibilities, which
must entail substantially equivalent skill, effort,
responsibility and authority.

29 C.F.R. § 825.215.

The regulation goes on to explain what is meant by the same or substantially

similar working conditions:

(e)  Equivalent terms and conditions of employment. An  equivalent position
must have substantially similar duties,        conditions, responsibilities,
privileges and status as the       employee's original position.

(1)    The employee must be reinstated to the same or a geographically
       proximate worksite (i.e., one that does not involve a significant
       increase in commuting time or distance) from where the employee had
       previously been employed. If the employee's original worksite has
       been   closed, the employee is entitled to the same rights as if the
       employee had not been on leave when the worksite closed.       For
       example, if an employer transfers all employees from a closed
       worksite to a new worksite in a different city, the employee on leave
       is also entitled to transfer under the same conditions as if he or she
       had continued to be employed.

(2)    The employee is ordinarily entitled to return to the same shift or the
       same or an equivalent work schedule.

(3)    The employee must have the same or an equivalent opportunity for
       bonuses, profit-sharing, and other similar discretionary and non-
       discretionary payments.

(4)    FMLA does not prohibit an employer from accommodating an
       employee's request to be restored to a different shift, schedule, or
       position which better suits the employee's personal needs on return
       from leave, or to offer a promotion to a better position. However, an

employee cannot be induced by the employer to accept a different position against the employee's wishes.

(2)

Konneker states that a suboxone waiver would allow her to prescribe medications and provide therapy to opiate addicted patients, which is significantly different from the job she had been performing wherein she dealt primarily with women and children and their primary health concerns. Konneker alleges opioid addiction is a specialized area in which she was never trained and one in which she previously was not required to work.

Konneker notes she would have been working with a completely different population. She had been certified as a family nurse practitioner. She had no experience or training—and no desire—to work with an addicted population.

Konneker further states she would have had to complete 80 hours of online study in order to obtain the suboxone license. Under the terms of her return from FMLA, Konneker was required to complete these requirements within 3 months while working a full schedule. She alleges this modified her job duties because it would have required her to work extra hours.

Konneker claims that by significantly altering her job duties, the regulation was violated and Konneker was prejudiced because she did not return to work for that reason.

The record shows that at the time she was hired, Konneker would not have been required to get her suboxone license.  Tarro testified that sometime in 2017, he and Weidner made the determination that all medical mid-levels would have to get their suboxone licenses.  The medical mid-levels were notified of this requirement by email and through staff meetings.

Weidner testified all of the providers were offered the opportunity to apply for a suboxone license.  The collaborating provider had to have it as well in order for the nurse practitioner to apply, so those who worked with Dr. Paniagua—like Konneker--would be able to apply.  Weidner testified that some nurse practitioners expressed concerns about working with suboxone which was outside their typical scope of practice.  She testified she did not expect all nurse practitioners to obtain their suboxone license because it depended on who their collaborating partner was.

Weidner testified she's sure she had a conversation with Konneker about obtaining her suboxone license because she talked to all of the providers about it. When asked if she encouraged Konneker to obtain the license, Weidner stated, "I'm a huge proponent for opiate recovery, so I'm sure I did.  But, again, everyone's license is their license, and not everybody is comfortable doing that."  D/E 15-7, 204.  Weidner further testified that she's "sure" Tarro told her that Konneker needed to obtain the license because he wanted as many people as possible to have it in order to build up the numbers.  When asked if Tarro told Weidner it was her responsibility

36

as supervisor to make sure Konneker gets her license, Weidner testified that the mid-levels had higher educational degrees and did not view herself as their supervisor. They viewed Tarro as their supervisor and would tell Weidner that if she ordered them to do something.  Weidner testified that if Tarro asked her to do anything, he asked her to provide Konneker and the other mid-levels with the information about the suboxone waiver.

Konneker's job description did change from the time she went on FMLA leave to what she was told her job duties would be when she returned.  However, the clinic where Konneker worked closed while she was off work and her original position was eliminated before she began her FMLA leave.  Therefore, she could not have been restored to the same position.

If Konneker's prior position had been available and she was still required to obtain a suboxone license, it appears she would be able to create a genuine issue of material fact regarding whether the Defendants interfered with her FMLA rights by reinstating her to a different and perhaps less desirable position.  This is based on the differences in the testimony of Tarro and Weidner regarding whether obtaining a suboxone license was a new requirement and the fact that there does not appear to be any documentary evidence on the issue, such as a memorandum or emails to staff. Because her former job no longer existed, it is a closer call regarding whether

Konneker is able to show that Defendants interfered with her FMLA rights by offering her an available position with similar duties at the Gillespie office.

As Konneker notes, however, her work history was as a family practitioner focusing on women and children. Upon her return from FMLA leave, she would be tasked with working with an addiction-based population.

Konneker also claims that having to complete 80 hours of work in a three-month period to obtain a suboxone certificate while also maintaining a full-time practice would be very difficult to accomplish.

The Defendants contend Konneker should have objected if she did not like the modifications to her job duties. Konneker responds by stating that although it was not necessary to do so, she did complain on multiple occasions.

To the extent that other jobs were available at the Department for nurse practitioners that did not require a suboxone license, the Court concludes there is just enough evidence in the record to create a genuine issue of material fact regarding whether Konneker's rights under the FMLA were interfered with by the Defendants.

(3)

There is also a factual dispute regarding whether the hours and shift Konneker would be required to work upon returning from FMLA leave interfered with her rights. Prior to her leave, Konneker's work day ended no later than 4:00 p.m. except for Wednesdays when she worked until 7:00 p.m. After her FMLA leave, Konneker

would be off on Wednesdays but have to work until 6:30 p.m. on Mondays, 6:00 p.m. on Tuesdays and 7:00 p.m. on Thursdays.  Additionally, Konneker claims she would have to work Wednesdays if needed and weekends "as scheduled."

Assuming that other jobs were available for nurse practitioners that had hours that were more comparable to Konneker's position prior to her leave, the Court concludes there is a factual dispute regarding whether the new hours she would be required to work post-FMLA leave constituted interference with her rights, in that it was not an "equivalent work schedule" pursuant to the regulations.

(4)

Konneker claims that the third modification that interfered with her rights is that she was required to obtain permission to take time off for a doctor's appointment at least 30 days in advance.  This deviated from the office policy that requires an employee must notify a supervisor in advance "when possible" and, if not possible, ½ hour before the start of a shift.

Most of the cited deposition testimony supports the Defendants' position that this provision applied to all the providers.  However, Konneker testified she believed the policy was just for her.  This is just enough to create a factual dispute.  *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 175 (7th Cir. 2021) (when evidence exists on both sides, plaintiff's deposition testimony can create a factual dispute that precludes the entry of summary judgment in favor of defendant).

Konneker claims that the modifications to her job duties and the alterations of the terms and conditions of her employment render her FMLA leave illusory and by taking these actions against her, the Department and Tarro violated the FMLA. She asks the Court to enter a summary finding that by altering the terms and conditions of her employment, the Department and Tarro interfered with her rights under the FMLA.

The Court is unable to conclude that summary judgment in Konneker's favor is warranted. She could not have been reinstated to the same job because it did not exist at the time. For the reasons stated herein, there are issues of fact regarding whether she was reinstated to a substantially equivalent position. Accordingly, Konneker is not entitled to summary judgment on this issue.

(5)

Based on the foregoing, the Court concludes there is a genuine issue of material fact regarding whether the Defendants interfered with Konneker's rights under the FMLA upon her return from leave by requiring her to obtain a suboxone certificate, altering her work hours, and requiring a 30-day notice for medical appointments.

To the extent that Konneker continues to allege that Defendants interfered with her rights under the FMLA when they failed to provide her with an eligibility notice or a rights and responsibilities notice at the time of her request for leave and

40

similarly failed to provide her with an FMLA designation notice prior to being contacted by Konneker's attorney, the Court concludes she was not prejudiced by those alleged violations.

FMLA retaliation

Konneker claims she was retaliated against for exercising her rights under the FMLA in three separate respects. She was given an abysmal job evaluation, she was terminated and she was placed on probation.

"Retaliation claims under the FMLA require that: (1) the employee engaged in statutorily protected activity; (2) the employer subjected her to an adverse action; and (3) the protected activity caused the adverse action." *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018).

The Defendants allege the timing of Konneker's termination on December 8, 2017—two days after she expressed a desire to take FMLA leave—was unfortunate but completely unrelated to her request for FMLA leave. They claim she was terminated for violating HIPAA.

Konneker contends there was no HIPAA violation because there was no disclosure of protected health information to a third party. However, there is no dispute that on December 6, 2017, Konneker came to her office to look for a copy of a patient's file she believed to be in her desk. When she could not locate the file, Konneker texted her medical assistant, Hamilton, to ask if she knew where the

41

documents were.  Konneker told Hamilton not to tell anyone about the text message, which suggests she believed her inquiry was inappropriate.  Weidner told Konneker it was inappropriate and that any communications about a patient's needs should be directed at her, not medical assistants.  While Konneker questions whether this was a HIPAA violation, she also told the Board that Weidner had done the same thing and was not terminated so she should not have been.  Konneker also admitted that she should have been disciplined for the incident, just not terminated.  Accordingly, even if Konneker's conduct did not constitute a HIPAA violation, there was at least a basis for Tarro and the Department to believe it did, given Konneker's accusation as to Weidner and her acknowledgment that some discipline was warranted.  The Court concludes, therefore, that Konneker's termination did not constitute FMLA retaliation.

As for Konneker's abysmal job evaluation, the Defendants contend this was her initial six-month evaluation that was completed in in September 2017 and given to her in January 2018.  It was thus completed before Konneker requested FMLA leave.  Relying on Weidner's deposition testimony, Konneker disputes that the evaluation given to her in January 2018 is the same one that was completed in September 2017.  Weidner's testimony does suggest that it was not the same evaluation.  However, Weidner testified that the evaluation she viewed in October 2017 was much harsher.  Therefore, Weidner and Garrison told Tarro it should not

be presented to Konneker at the time because of the personal issues she was experiencing. If this "very cut-throat" evaluation was completed before Konneker requested FMLA leave, it obviously was not in retaliation for Konneker exercising that statutory right. It also would not be FMLA retaliation for making the evaluation that was eventually given to Konneker less harsh than the pre-FMLA evaluation.

Konneker also claims the grounds for her probation are not clear. Several members of the Department's Board of Health submitted affidavits which stated that one of Konneker's conditions of reinstatement was that she serve a term of probation. Therefore, the condition was required by the Board. Moreover, probation would appear to be a fairly routine requirement for a public employee who is terminated from a position and then reinstated. Accordingly, the Court concludes that Konneker's probation did not constitute retaliation.

Based on the foregoing, the Court concludes that Defendants are entitled to summary judgment on Konneker's retaliation claims.

Tarro's liability

The Defendants claim Tarro should not be individually liable. The Defendants acknowledge that although there is a circuit split on the issue of individual liability under the FMLA, most courts that have addressed the issue, including several district courts in the Northern District of Illinois, have found that public employees can be individually liable under the FMLA. *See Coleman v.*

*Illinois Dep.t of Human Services*, 2013 WL 5348314, at *18 n.18 (N.D. Ill. 2013) (citing *McGee v. City of Chicago*, 2011 WL4382484, at *8 (N.D. Ill. 2011); *Plaxico v. Cnty. of Cook*, 2010 WL 3171495, at *5 (N.D. Ill. 2010)).  The Seventh Circuit has not specifically addressed the issue, though it has rejected the Eleventh Circuit's reasoning for holding that there is no individual liability for public employees under the FMLA.  *See Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001).

Because definitions of "employer" in the FLSA and FMLA are materially the same, courts may look to interpretations of the FLSA to construe the FMLA.  *See* 29 C.F.R. § 825.104(d).  Under the FLSA, a person is considered an "employer" and subject to individual liability if two conditions are met: (1) the individual had supervisory authority over the plaintiff; and (2) the individual was at least partly responsible for the alleged violation.  *See Alcazar-Anselmo v. City of Chicago*, 2008 WL 1805380, at *2 (N.D. Ill. 2008).

The Court will follow the authority from district courts within the Seventh Circuit and hold that public employees can be individually liable under the FMLA. Tarro also appears to meet the criteria as an "employer" subject to individual liability.

The Defendants provide a number of reasons why Tarro should not be liable for any alleged violation.  The Board of Health, not Tarro, had the final say as to whether Konneker would be reinstated and, if so, the terms of her reinstatement.

Moreover, Tarro is the one who granted FMLA leave to Konneker even though she was not yet eligible.  Additionally, Konneker was not prejudiced by any alleged violation.  While these may all be good reasons why Tarro should not be liable for an alleged violation, the Court concludes only that public employees like Tarro can be liable under the FMLA.

### Qualified immunity

The Defendants allege Tarro is entitled to qualified immunity.  Qualified immunity attaches unless the plaintiff shows the defendant (1) violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.  *See Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).  For a right to be clearly established, the "contours" of the law must be so "definite" that "any reasonable official in the defendant's shoes would have understood that he was violating it."  *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018).

As this Court just noted, there is no controlling authority on the issue of individual liability under the FMLA.  Neither the United States Supreme Court nor the Seventh Circuit has addressed the issue.  That answers the qualified immunity question. Because some courts have determined that public employees can be individually liable under the FMLA and other courts have determined they are not subject to individual liability, there obviously is no clearly established statutory

right. Accordingly, Tarro is entitled to summary judgment on the individual liability claims.

> Illinois Wage Payment and Collection Act claim

The Defendants contend summary judgment is warranted on Konneker's Wage Act claim. Section 14(a) of the Wage Act provides in part: "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages." 820 ILCS 115/14(a). "[W]ages is defined as "any compensation owed to an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2. "Final compensation" is defined in the Wage Act as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." *Id*.

The August 1, 2016 letter outlining the terms and conditions of Konneker's employment provided her initial salary would be $84,000 per year. The letter further stated that after successfully completing the six-month probationary period, Konneker's salary would increase to $87,360.

The agreement between the parties regarding compensation was memorialized in Konneker's acceptance letter, which provided that she is entitled to a salary increase upon successful completion of her initial six month probationary period. The acceptance letter further stated, "The department personnel policies outline the manner in which employee policies are administered."

The Department's personnel policy manual states, "At the conclusion of the six-month probationary period, a probationary employee's performance shall be formally evaluated by his or her supervisor in accordance with the performance evaluation outlined in later paragraphs." The performance evaluation section of the personnel policy manual provides that, "In order to be eligible for a merit increase, an employee must receive an overall rating from his/her supervisor of SATISFACTORY." (emphasis in original).

The Defendants note that in order to be eligible for a merit increase, the employee must receive an overall rating of satisfactory. Because Konneker never received an overall rating of satisfactory, the Defendants claim she is not entitled to the salary increase.

Konneker responds by stating that her agreement with the Department did not describe the potential salary increase as a "merit increase."

The Court has little doubt that the Defendants' interpretation evinces the intent of the Parties. That is the most logical interpretation. However, Konneker is correct

47

that her salary increase after six months is not described in the agreement as a "merit increase." The Parties' agreement says Konneker is entitled to a raise after successfully completing her six-month probationary period. Successful completion might be interpreted to mean Konneker had to receive a "SATISFACTORY" rating on her evaluation. A less likely but plausible interpretation is that Konneker would be entitled to a raise if she were still employed at the end of the six-month probationary period.

Courts interpreting the Wage Act apply the traditional rule that any ambiguities in a contract are resolved against the drafter of the contract. *Covinsky v. Hannah Marine Corp.*, 388 Ill. App.3d 478, 484 (1st Dist. 2009).

The ambiguity here involves whether the Parties' agreement involved a "merit increase" or an unconditional increase in wages. Because the drafter of the agreement did not specify, the issue must be resolved against the Department. Moreover, the policy manual does not say that an employee has to receive a satisfactory performance evaluation in order to receive a salary increase.

Based on the foregoing, the Court will grant Konneker's motion for partial summary judgment on this issue and deny this portion of the Defendants' motion. Accordingly, the Court finds that the Department violated her rights under the Wage Act by failing to pay her the agreed amount once she had been working at the Department for six months.

### III.    CONCLUSION

For the reasons stated herein, the Defendants' motion for summary judgment will be granted as to Defendant Kent Tarro on the basis of qualified immunity.

The Defendants' motion on Count I as to Defendant Macoupin County Public Health Department will be denied as to the FMLA interference claim and granted as to the FMLA retaliation claim.

The Defendants' motion for summary judgment as to Count II will be denied.

Plaintiff Ashley Konneker's motion for partial summary judgment will be denied as to the FMLA interference claim in Count I and granted as to Count II.  The issue of damages on the Wage Act claim in Count II will be set for trial.

Ergo, the Motion for Summary Judgment of Defendants Macoupin County Public Health Department and Kent Tarro [d/e 15] is GRANTED in part and DENIED in part.

The Motion is GRANTED as to the claims against Defendant Tarro.  The Clerk will terminate Tarro as a party.

The Motion on Count I as to Defendant Macoupin County Public Health Department is DENIED as to the FMLA interference claim and GRANTED as to the FMLA retaliation claim.

The Defendants' Motion as to Count II is DENIED.

The Motion for Partial Summary Judgment of Plaintiff Ashley Konneker [d/e 19] is GRANTED in part and DENIED in part.

The Plaintiff's Motion is DENIED as to the FMLA interference claim in Count I.

The Plaintiff's Motion for Partial Summary Judgment is GRANTED as to the Wage Act claim in Count II.

ENTER: May 25, 2021

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge